UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DeJUAN LOWE,

Plaintiff,

v.                                          CAUSE NO. 3:23-CV-607-CCB

NANCY B. MARTHAKIS,

Defendant.

OPINION AND ORDER

DeJuan Lowe, a prisoner without a lawyer, is proceeding in this case "against Dr.
Nancy B. Marthakis in her individual capacity for compensatory and punitive damages
for persisting in a course of ineffective treatment of Mr. Lowe's gastritis and ulcerative
colitis from 2013 through 2023 in violation of the Eighth Amendment[.]" ECF 9 at 5. Dr.
Marthakis filed a motion for summary judgment. ECF 64. Lowe filed a response, and
Dr. Marthakis filed a reply. ECF 76, 78, 81, 82. Dr. Marthakis' summary judgment
motion is now fully briefed and ripe for ruling.

Summary judgment must be granted when "there is no genuine dispute as to
any material fact and the movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a
reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes
summary judgment inappropriate; "[o]nly disputes over facts that might affect the
outcome of the suit under the governing law will properly preclude the entry of

summary judgment." *Id*. To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009).

Under the Eighth Amendment, inmates are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical
> treatment to prisoners, but rather they must provide medical treatment
> that reflects professional judgment, practice, or standards. There is not one
> proper way to practice medicine in a prison, but rather a range of
> acceptable courses based on prevailing standards in the field. A medical

> professional's treatment decisions will be accorded deference unless no
> minimally competent professional would have so responded under those
> circumstances.

*Id.* at 697-698. Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Where the defendant has provided some level of care for a prisoner's medical condition, in order to establish deliberate indifference the prisoner must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the appropriate treatment does not amount to an Eighth Amendment violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

Dr. Marthakis provides Lowe's medical records, her own affidavit, and information about ulcerative colitis and Crohn's disease,[1] which show the following facts: During all relevant times, Dr. Marthakis was the Medical Director at Indiana State Prison ("ISP"). ECF 66-2 at 1. All medical providers at ISP, including Dr. Marthakis, are required to obtain prior authorization for all off-site specialty services such as specialist consultations and procedures by submitting an offsite provider request ("OPR") to a designated reviewer. *Id.* at 2. Prior authorization is also required before a medical

---

[1] As discussed below, Lowe's medical providers originally diagnosed him with ulcerative colitis and later made findings consistent with Crohn's disease.

provider can order non-formulary medications by submitting a formulary exception request ("FER"). *Id.*

Ulcerative colitis ("UC") is a chronic inflammatory bowel disease in which the large intestine becomes inflamed and ulcerated, leading to flare-ups of bloody diarrhea, abdominal cramps, and fever. ECF 66-3 at 1-2. UC treatment aims to control inflammation, reduce symptoms, and replace lost fluids and nutrients. *Id.* at 5. Aminosalicylates such as mesalamine (Lialda) and balsalazide (Colazal) are used to reduce inflammation and prevent flare-ups. *Id.* at 6. People with moderately severe UC may also take corticosteroids like prednisone in fairly high doses, which can induce a dramatic remission. *Id.* Immunomodulating medications like azathioprine (Imuran) are used to maintain remission in individuals with UC who would otherwise need long-term corticosteroid treatment. *Id.* at 7. Additionally, monoclonal antibody ("MAB") drugs, a class of biologic agents, may be given to individuals who do not respond to corticosteroids or who develop symptoms when corticosteroid doses are lowered. *Id.* at 7.

For some individuals with UC, consuming gluten can trigger or worsen symptoms like abdominal pain, bloating, and diarrhea, potentially leading to more frequent or severe flare ups. ECF 66-2 at 2. At ISP, gluten-free diet requests require an FER, which is reviewed and approved by IDOC. *Id.* at 3. IDOC approval may be denied or revoked if commissary records demonstrate an inmate has been purchasing non-gluten free items. *Id.* Regular follow-ups with medical providers help manage chronic conditions such as UC. *Id.* When patients do not take medications as prescribed, do not

4

comply with dietary recommendations, and do not show up for provider visits, it becomes difficult to understand their conditions, assess whether prescribed medications are working, and gauge appropriate, effective treatment. *Id*. Some medications used to treat UC, such as Imuran, may not work right away, so it is important for patients to continue taking it even if it does not seem to be working at first. *Id.* There is also a risk of relapse if a patient stops taking their UC medications as directed. *Id.* Following a physician's instructions for UC is crucial for managing the disease, preventing complications, and improving quality of life, as it helps achieve remission and reduces flare-ups. *Id.*

As a primary care provider seeing a patient like Lowe whose GI issues were being monitored by GI specialists, the standard of care for Dr. Marthakis was to rely on the specialists to diagnose and recommend treatment for Lowe's UC and Crohn's disease. ECF 66-2 at 3-4. Depending on the severity of the disease, the standard of care includes collaboration of care with the inmate's offsite medical specialists such as gastroenterologists, radiologists, and general surgeons, and deferring to the specialists to order appropriate diagnostic tests, diagnose the patient's condition, and formulate an appropriate treatment plan including specialty consultations and medication recommendations for aminosalicylates, immunomodulating medications, and MABs. *Id.* Dr. Marthakis would not unilaterally add any of these medications to Lowe's treatment regimen, as that could interfere with the gastroenterologist's treatment plan. *Id*. Whenever Lowe's specialists recommended certain treatment plans, Dr. Marthakis' role was to submit OPRs and FERs to receive authorization for those treatments. *Id*. Dr.

Marthakis also saw Lowe for chronic care visits ("CCV") to monitor his condition and the effectiveness of his treatment, and she could provide treatment for acute flare-ups by ordering corticosteroid therapy, antibiotics, and other formulary interventions. *Id.*

Lowe's medical records show the following facts: In 2013, before Dr. Marthakis was employed at ISP, gastroenterologist Eugene Lyubashevsky diagnosed Lowe with UC and concluded he needed Humira, an MAB medication. ECF 66-1 at 255. Per Dr. Lyubashevsky's recommendation, a physician at ISP submitted an FER for Lowe to receive Humira, and Humira was added to Lowe's medication and administration record, though it is unclear whether he ever actually received the medication. *Id.* at 239, 252-53. Between 2014 and 2017, it appears Lowe took Colazal and Lialda for his UC, and his Humira prescription was not renewed after it expired in May 2013. *Id.* at 3-7.

On February 2, 2018, Dr. Marthakis first began seeing Lowe for his UC and submitted an FER so he could receive a gluten-free diet. ECF 66-2 at 5; ECF 66-1 at 236-37. At that time, Lowe was actively taking Colazal and Lialda. ECF 66-2 at 5.

On March 1, 2018, Nurse Diane Thews saw Lowe for a CCV for his UC. ECF 66-1 at 232-34. She noted his UC was controlled on medication and he denied any abdominal pain, nausea, and vomiting, though he reported he had "spots of blood on his shorts sometimes." *Id.* Nurse Thews renewed Lowe's prescriptions for Colazal, Lialda, and Zantac. *Id.* at 234.

On May 17, 2018, Lowe did not show up for his scheduled CCV. ECF 66-1 at 231. On August 24, 2018, Lowe did not show up for another scheduled CCV. *Id.* at 226.

On August 28, 2018, Dr. Marthakis saw Lowe for his rescheduled CCV for his UC. ECF 66-2 at 5; ECF 66-1 at 223-25. Lowe reported the gluten-free diet and medications were helping, but again reported "some bleeding/seepage on his underwear" and requested pads. *Id.* Dr. Marthakis' plan was to renew his Colazal and Zantac prescriptions, submit an FER for the renewal of Lialda, request renewal of a gluten-free diet, and submit an OPR for a colonoscopy, as Lowe was due for repeat testing. *Id.*

On September 14, 2018, Lowe attended sick call and reported anal pain and concern of a possible infection. ECF 66-2 at 5; ECF 66-1 at 214-16. Dr. Marthakis was consulted and prescribed a 10-day course of Bactrim-DS. *Id.* Lowe was also provided with Tylenol and absorbent pads. *Id.*

On November 16, 2018, Dr. Marthakis submitted an FER to renew Lowe's gluten-free diet, which was approved. ECF 66-1 at 210-13.

On December 17, 2018, Dr. Marthakis saw Lowe for a follow-up on his UC. ECF 66-2 at 5; ECF 66-1 at 207-09. The physical examination was unremarkable, and Dr. Marthakis continued Lowe on his current medications and resubmitted a second OPR for a colonoscopy. *Id.* On January 16, 2019, Lowe refused bowel prep for the colonoscopy. ECF 66-1 at 205. On February 25, 2019, Lowe's gluten-free diet request was denied by IDOC because he had been purchasing items containing gluten from the commissary. *Id.* at 200-01.[2]

---

[2] Lowe concedes he did not comply with his gluten-free diet, but argues he never had an issue with gluten and can eat "whatever he desires" as long as he is receiving the correct medication. ECF 76 at 5; ECF 78 at 7.

On February 27, 2019, Dr. Lyubashevsky performed Lowe's colonoscopy and observed areas of "severe inflammation." ECF 66-1 at 325. Dr. Lyubashevsky recommended the continuation of current medications and a gluten-free diet, and requested a CT scan of the abdomen and pelvis to review at the next appointment. *Id.*

Following the colonoscopy, Dr. Marthakis followed Dr. Lyubashevsky's recommendation by continuing Lowe on his current medications and submitting an OPR for a CT scan of his abdomen and pelvis. ECF 66-2 at 5. Given the importance of medication compliance in the treatment and management of UC, Dr. Marthakis began requiring that Lowe obtain his medications in the Directly Observed Therapy ("DOT") line. *Id.* She educated Lowe on the need to take his medications as directed and of the risk of losing his gluten-free diet approval if he continued to purchase gluten items from the commissary. *Id.*

On March 7, Lowe did not show up for his scheduled CCV. ECF 66-1 at 194. On March 11, 2019, Dr. Marthakis submitted a second OPR for a CT scan after not receiving prior OPR approval. ECF 66-2 at 5. She also saw Lowe for a rescheduled CCV. ECF 66-1 at 190-92. She went over the colonoscopy biopsies and findings, renewed his Lialda and Colazal medications, and explained to him that the FER for a gluten-free diet may be denied because his commissary purchases again contained food items with gluten. *Id.* On March 14, 2019, Dr. Marthakis' FER for a gluten-free diet was approved. *Id.* at 186.

On March 21, 2019, Dr. Marthakis again educated Lowe on the importance of medication compliance, as her OPR for a CT scan had received an alternative treatment plan ("ATP") because he "needs to be compliant with the DOT medline." ECF 66-2 at 5;

ECF 66-1 at 183-85. The ATP of the OPR prevented Dr. Marthakis from ordering the CT studies. *Id.* She advised Lowe that his medications needed to be taken in the DOT line, educated him on the importance of being compliant with his treatment regimen, and ordered labs. *Id.*

On May 28, 2019, Dr. Marthakis saw Lowe for a CCV. ECF 66-1 at 179-181. When asked about his medication compliance, Lowe responded "for the most part I have been going." *Id.* Lowe denied abdominal pain, constipation, or diarrhea, but reported he had "blood-tinged spotting on his undergarments." Dr. Marthakis ordered routine labs and refills for his Colazal, Lialda, and Zantac prescriptions. *Id.*

On August 14, 2019, Dr. Marthakis saw Lowe for a CCV, examined him, and noted he had developed rectal drainage not associated with bowel movement, weight loss, and a crack or small tear in the anus. ECF 66-2 at 6; ECF 66-1 at 176-77. Because of these symptoms, she submitted an OPR for a GI consultation. *Id.*; ECF 66-1 at 173-75.

On August 27, 2019, Lowe's gluten-free diet was discontinued because he continued to order gluten products from the commissary. ECF 66-1 at 172. He had also failed to show up for a scheduled appointment. *Id.* at 171.

On August 28, 2019, Dr. Marthakis saw Lowe for a rescheduled visit. ECF 66-1 at 165-70. She submitted a second OPR for a GI consultation because the first OPR had not yet been approved and Lowe had continued complaints of weight loss, abdominal pain, and diarrhea. *Id.*; ECF 66-2 at 6. In the interim, Dr. Marthakis provided Lowe with steroids for the flare-up and topical lidocaine for pain relief associated with the anal fissure. *Id.*

On September 26, 2019, Dr. Marthakis saw Lowe for a CCV, noted he had almost finished his long tapering dose of oral prednisone, and ordered labs to check for infection and inflammatory markers in response to his continued symptoms. ECF 66-2 at 6; ECF 66-1 at 162-64. The lab results came back normal. *Id.*

On October 8, 2019, Dr. Marthakis continued to work to manage Lowe's ongoing symptoms while she waited for the OPR for the GI consultation to be approved by ordering intramuscular as well as oral steroids. ECF 66-2 at 6; ECF 66-1 at 155-58. Lowe received an injection of solumedrol and a new prednisone prescription. *Id.* Dr. Marthakis also documented that Lowe's medication compliance was confirmed by the drug room, and her plan was to continue current medications but also "consider MAB treatment," though she could not unilaterally add an MAB to Lowe's treatment regimen without first receiving a recommendation from a GI specialist and an FER approval. *Id.*

On October 17, 2019, Dr. Marthakis examined Lowe and submitted a third urgent OPR for a CT scan and GI consultation after Lowe reported lack of complete symptom relief with oral prednisone and her examination showed he had developed an anal fistula.[3] ECF 66-2 at 6; ECF 66-1 at 146-150. She also ordered IV methylprednisolone followed by a course of oral prednisone with the goal of inducing remission. *Id.* The CT scan was approved that same day and performed on October 25, but showed no acute abdominal or pelvic process, no masses, and no lymphadenopathy. ECF 66-1 at 317-18.

---

[3] A tunnel that develops between the inside of the anus and the outside skin around the anus. *See Anal fistula - Symptoms and causes - Mayo Clinic* (last visited February 9, 2026).

On November 7, 2019, Dr. Marthakis submitted a fourth OPR for a GI consultation after the CT scan showed no acute abdominal or pelvic process. ECF 66-2 at 6. On November 12, 2019, Dr. Marthakis submitted an FER for an increase in Lowe's Lialda dosage pending approval of the GI consultation, as Lowe had become compliant with his medications and she was able to gauge that his current dosage was not effective. *Id.*; ECF 66-1 at 140-42. Also on November 12, Lowe's gluten-free diet was again discontinued by IDOC because his commissary list showed he purchased multiple food items containing gluten, including numerous cookie and cereal purchases. ECF 66-1 at 138, 305-07.

On December 20, 2019, Lowe did not appear for his scheduled medical appointment. ECF 66-1 at 133. On December 31, 2019, Lowe had an offsite GI consultation with GI specialist Dr. David Fumo. *Id.* at 308-15. Dr. Fumo noted Lowe had "rather severe Crohn's disease" and now had a perianal fistula that was actively draining. *Id.* at 313. He recommended: (1) two oral antibiotics called Flagyl and Levaquin; (2) CT scans of the abdomen and pelvis; (3) surgical consultation for the fistula; (4) a "T PMT" test before starting Lowe on Imuran; and (5) a follow-up appointment. *Id.* Dr. Fumo did not recommend any MAB drugs such as Humira. *Id.* That same day, Dr. Marthakis followed two of Dr. Fumo's treatment recommendations by ordering the antibiotics and the labs needed prior to initiating Imuran. ECF 66-2 at 7. On January 2, 2020, ISP's medical staff directed a fax to Dr. Lyubashevsky's office (the same office as Dr. Fumo) advising that Lowe had just had a CT scan on October 25, 2019, and providing the results of that CT scan. ECF 66-1 at 316.

On January 3, 2020, Dr. Marthakis saw Lowe for a chronic care visit and noted he'd begun the antibiotic regimen as ordered by Dr. Fumo. ECF 66-1 at 128-30. Lowe reported intermittent abdominal pain but no nausea, vomiting or fever. *Id.* Dr. Marthakis noted that the revised plan from Dr. Fumo's office after receiving and reviewing the results of the October 25 CT scan were to proceed with the antibiotics, take the necessary labs to start Lowe on Imuran, start Lowe on oral prednisone, and if this plan proved ineffective then Dr. Fumo recommended "repeating CT scan and referral to surgery." *Id.* at 130. On January 15, 2020, Imuran therapy was initiated. ECF 66-2 at 7; ECF 66-1 at 126. Lowe continued to take Colazal and prednisone. *Id.*

From January 15 through the end of 2020, Lowe regularly exhibited noncompliance with his treatment regimen by not taking medications as directed, consuming gluten, and missing approximately 17 scheduled medical appointments. ECF 66-2 at 7. Specifically, on February 4, 2020, Lowe did not show up for a scheduled CCV. ECF 66-1 at 127. On February 11, Lowe saw Dr. Marthakis, reported drainage but denied abdominal pain, and Dr. Marthakis again educated him to avoid foods containing gluten. *Id.* at 124-26. On February 18, Dr. Marthakis' FER for a gluten-free diet was denied by IDOC because Lowe's commissary records showed he'd been purchasing food items containing gluten. *Id.* at 123. On February 18, Lowe did not show up for a scheduled medical appointment. *Id.* at 122. On February 21, Lowe saw a nurse, reported weight loss, and expressed that he wanted to resume the gluten-free diet. *Id.* at 120. Lowe missed his next three scheduled appointments. *Id.* at 117-19. On March 24, Lowe saw a nurse, complained of weight loss, and reported abdominal pain that was

aggravated by food. *Id.* at 114-15. On March 31, Dr. Marthakis saw Lowe for a CCV and noted he had missed a few doses of his DOT medications. *Id.* at 111-13. She ordered labs, instructed Lowe to continue taking Colazal and Imuran as directed, and ordered a follow-up appointment in six weeks. *Id.*

On May 26, Lowe did not show up for his scheduled CCV. ECF 66-1 at 110. He then missed his next five scheduled appointments. *Id.* at 105-09. On July 10, Lowe finally presented for a scheduled CCV. *Id.* at 102-04. Nurse Thews noted he was non-compliant with his medication and had not taken his medication in the past week and a half. *Id.* Nurse Thews educated Lowe on the importance of taking every dose of his medications and instructed him to increase his intake of fruits, vegetables, fiber and fluids. *Id.*

On August 6, Dr. Marthakis saw Lowe, noted his labs showed no evidence of an infection or inflammation in the body, and emphasized that he needed to take his prescribed doses of Imuran and Colazal. ECF 66-1 at 95-97. On August 10, Dr. Marthakis reviewed Lowe's labs, noted his Vitamin B-12 was low, and ordered Vitamin B-12 supplements and periodic monitoring of his labs. *Id.* at 93.

Throughout October 2020, Lowe did not show up for all four of his scheduled CCV appointments. ECF 66-1 at 89-92. On November 20, 2020, Lowe saw a nurse and reported his medications were "not helping," and explained he had stopped taking his medications a week before because they did not help. *Id.* at 86-87. Lowe then missed his next two scheduled CCV appointments. *Id.* at 84-85.

On December 2, 2020, Dr. Marthakis saw Lowe and noted he had not been compliant with attending his scheduled CCV appointments. ECF 66-1 at 81-83. Lowe reported he had a "flare up" of inflammation with mild abdominal pain and tenderness, so Dr. Marthakis instructed him to continue taking his prescribed Colazal and Imuran and ordered an oral prednisone taper for his flare-up, regular labs, and a six-week follow-up. *Id.* ECF 66-2 at 7. Dr. Marthakis attests that Lowe's noncompliance throughout 2020 interfered with her ability to manage his UC and related symptoms and to assess whether his new Imuran medication was effective. ECF 66-2 at 7.

On February 2, 2021, Dr. Marthakis saw Lowe for a CCV and noted he had gained weight, reported no abdominal pain, and reported his rectal bleeding was "resolving." ECF 66-1 at 78-81. A physical examination was normal, and Dr. Marthakis ordered renewals of his Colazal, Vitamin B-12, Imuran, and oral prednisone. *Id.*

On May 18, 2021, Dr. Marthakis saw Lowe for a CCV and he reported no abdominal pain or rectal bleeding and that he was "doing well on medications." ECF 66-1 at 75-77. Dr. Marthakis ordered labs, renewed his meds, and ordered a 3-month follow up. *Id.*

On July 27, 2021, Lowe was transferred from ISP to Westville Correctional Facility ("WCF"), where he was no longer under Dr. Marthakis' care. ECF 66-1 at 68. On January 13, 2022, Lowe was transferred back to ISP and reentered into Dr. Marthakis' care. *Id.* at 60.

On January 26, 2022, Dr. Marthakis saw Lowe for a CCV and he reported "intermittent abdominal pain" but "no pain right now." ECF 66-1 at 57-59. He denied

14

fever, bloody stool, or recent significant weight loss, and a physical examination was normal. *Id.* Dr. Marthakis ordered labs, renewed his Colazal, Imuran, and Vitamin B-12 medications, and ordered a 6-month follow-up. *Id.* On February 28, 2022, Lowe submitted a healthcare request form complaining his current medications were ineffective, but then did not show up for a medical appointment scheduled for March 11 and refused a provider visit scheduled for March 24. *Id.* at 259.

On April 7, 2022, Lowe saw Nurse Thews and reported abdominal pain, nausea, and occasional blood in his stools and stated his medications were not working. ECF 66-1 at 54-56. Nurse Thews consulted with Dr. Marthakis who recommended obtaining a stool sample to check for blood and infection. *Id.*

On April 27, 2022, Lowe saw Nurse Thews and reported he was compliant with Imuran and Colazal but had "anal leakage with blood/pus." ECF 66-1 at 48-53. Nurse Thews consulted with Dr. Marthakis who recommended an OPR for a GI consultation, which Nurse Thews submitted. *Id.*; ECF 66-2 at 7.

On May 24, 2022, Lowe saw a nurse practitioner at Dr. Fumo's office, whose plan included the antibiotics Cipro and Flagyl, a pelvic MRI, checking azathioprine levels for therapeutic therapy, consideration of a surgical consultation, and possibly another colonoscopy depending on how that plan progressed. ECF 66-1 at 297-304. Dr. Marthakis followed these recommendations by submitting an OPR for a pelvic MRI and prescribing Flagyl and Cipro. ECF 66-2 at 7; ECF 66-1 at 327-28.

On June 15, 2022, after an MRI showed fistula formation, Dr. Marthakis submitted an OPR for a surgical consultation as recommended by the specialists. ECF

66-2 at 7; ECF 66-1 at 45-46. On July 26, 2022, Lowe received a surgical consultation with Dr. Blake Hood, who noted he had multiple peri-anal fistulas, requested additional records, and stated Crohn's disease needed to be ruled out before he could recommend repairing the fistulas. ECF 66-1 at 289-90.

On September 1, 2022, Lowe received another colonoscopy. ECF 66-1 at 287-88. The doctor diagnosed him with chronic colitis with minimal to mild activity and noted he also observed findings compatible with Crohn's disease. *Id.*

Following Lowe's September 1 colonoscopy, Dr. Marthakis submitted an OPR for a follow-up GI consultation per the recommended treatment plan. ECF 66-2 at 8; ECF 66-1 at 38-39. On September 7, 2022, while awaiting further guidance from the specialists, Dr. Marthakis attempted to control Lowe's symptoms by ordering oral prednisone. ECF 66-2 at 8. On September 21, Lowe reported the prednisone had helped. *Id*. On November 16, 2022, Lowe underwent another CT scan as recommended by Dr. Hood, which had findings consistent with Crohn's disease. ECF 66-1 at 25-28, 286. From that point, Lowe's chronic care was managed by nurse practitioners and Dr. Marthakis no longer was involved in his treatment. ECF 66-2 at 8. By the date of Dr. Marthakis' next involvement in Lowe's care on August 2, 2023, his GI specialists had completed their workup and had started him on infusions of Avsola, an MAB medication, which Lowe reported had improved his symptoms. *Id.*

Dr. Marthakis argues summary judgment is warranted in her favor because she complied with all applicable standards of care in her treatment and management of Lowe's UC and suspected Crohn's disease by timely implementing all treatment

recommendations provided by the specialists, submitting multiple OPRs for procedures, diagnostic tests and specialty consults, submitting multiple FERs for nonformulary medications and a gluten-free diet, ordering prednisone and other treatments when Lowe experienced flare-ups, and submitting OPRs for specialty consults when Lowe stopped responding to prednisone and developed fistulas despite taking the medications recommended by the GI specialists. ECF 67 at 6-13. She attests she never impeded the diagnosis and treatment of Lowe's UC and suspected Crohn's disease, but rather submitted OPRs and FERs as indicated and as recommended by the specialists and conducted appropriate management of Lowe's condition between specialist visits. ECF 66-2 at 8. Moreover, she attests that the timing of specialty consults, development of a treatment plan, and implementation of the treatment plan were dictated by the specialists, the designated reviewer's approval of FERs and OPRs, and Lowe's compliance with recommended treatment. *Id.* Dr. Marthakis attests that Lowe's condition was not caused by a lack of reasonable care, but rather his symptoms including abdominal pain, rectal bleeding, inflammation, and fistula formation were caused by the natural progression of his disease and his noncompliance with treatment recommendations. *Id.* Lastly, Dr. Marthakis attests that Lowe's noncompliance with his medications, diet, and scheduled medical appointments made it challenging for her to determine whether the treatment plan recommended by the specialists was effective. *Id.*

Here, it is undisputed Dr. Marthakis provided treatment for Lowe's UC and suspected Crohn's disease by regularly monitoring his condition, submitting OPRs so he could be seen by GI specialists when necessary, submitting OPRs and FERS to carry

out the treatment recommendations of the GI specialists, and regularly providing Lowe medications including antibiotics, aminosalicylate medications like Colazal and Lialda, and steroids like prednisone. To survive summary judgment, Lowe must provide evidence this treatment provided by Dr. Marthakis was "plainly inappropriate" or violated a standard of care. *See Hayes*, 546 F.3d at 524. Lowe raises two arguments in this regard.

First, Lowe argues Dr. Marthakis delayed in submitting an OPR for a surgical consultation. ECF 78 at 5. It is undisputed Dr. Marthakis submitted an OPR for a surgical consultation on June 15, 2022, after an MRI showed fistula formation, and Lowe then received a surgical consultation with Dr. Hood who requested additional records and stated Crohn's disease needed to be ruled out before he could recommend repairing the fistulas. *See* ECF 66-1 at 45-46, 289-90; ECF 66-2 at 7. Lowe then received another colonoscopy and CT scan as recommended by Dr. Hood, which had findings consistent with Crohn's disease, and there's no evidence Dr. Hood ever recommended surgery again after that point. *See* ECF 66-1 at 25-28, 286-88. In his response, Lowe argues Dr. Marthakis should have submitted the OPR earlier than June 2022, and cites to two exhibits in support of this argument. ECF 76 at 10.

The first exhibit cited by Lowe is a suggestion from Dr. Lyubashevsky from November 18, 2014, that Lowe be referred for a surgical consultation. ECF 77-1 at 1. This exhibit is not relevant here, as it is undisputed Dr. Marthakis only arrived at ISP and became involved in Lowe's treatment in 2018, and there's no evidence Dr. Lyubashevsky still was recommending a surgical consultation at that time. No

reasonable jury could conclude Dr. Marthakis was deliberately indifferent for failing to follow a recommendation made four years before she began treating Lowe. The second exhibit cited by Lowe are the records from his December 31, 2019, appointment with Dr. Fumo, where Dr. Fumo recommended Lowe receive: (1) two antibiotics; (2) CT scans of his abdomen and pelvis; (3) labs before starting on Imuran; (4) a surgical consultation for the fistula; and (5) a follow-up appointment. ECF 77-1 at 2-3. It is true Dr. Marthakis did not submit an OPR for a surgical consultation at that time. But the record shows that, following this appointment with Dr. Fumo, ISP faxed Dr. Fumo's office the results of Lowe's October 25, 2019, CT scan, and Dr. Marthakis noted in Lowe's medical records that Dr. Fumo's <u>revised</u> plan after receiving those results was to proceed with the original plan regarding the Imuran and antibiotics and, *if* that plan proved ineffective, to schedule another CT scan and refer to surgery. ECF 66-1 at 128-30, 316; ECF 66-2 at 7. At that point, Lowe became noncompliant with his medication and diet and began missing numerous scheduled medical appointments, which made it difficult for Dr. Marthakis to assess whether the treatment he was receiving was effective. ECF 66-2 at 7; *see Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005) (an inmate cannot be permitted to "engineer" a constitutional violation). Accordingly, the undisputed evidence shows that, while Dr. Fumo did initially suggest a surgical consultation on December 31, 2019, he was then provided with the results of Lowe's CT scan and changed his recommendation so Lowe would only be sent for a surgical consultation if his current treatment plan proved ineffective. It is undisputed Lowe then became noncompliant and there is no evidence Dr. Fumo made another recommendation for a

surgical consultation at that time. Instead, the record shows Dr. Fumo's office next made a recommendation for a surgical consultation on May 24, 2022, which resulted in Dr. Marthakis submitting the June 15 OPR for a surgical consultation and Lowe being seen for a surgical consultation with Dr. Hood. *See* ECF 66-1 at 327-28. Therefore, the undisputed evidence shows Dr. Marthakis did follow the recommendations of Dr. Fumo by waiting until June 15, 2022, to submit an OPR for a surgical consultation, and no reasonable jury could conclude Dr. Marthakis' handling of this situation was "plainly inappropriate."[4]

Second, Lowe argues Dr. Marthakis' treatment was "plainly inappropriate" because she failed to provide him MAB drugs such as Humira. ECF 76 at 4-5; ECF 78 at 5-7. Specifically, Lowe points to the fact that Dr. Lyubashevsky prescribed him Humira back in 2013, and argues Dr. Marthakis therefore should have begun providing him Humira once his aminosalicylate medications Lialda and Colazal proved ineffective. ECF 78 at 9, 12-13. Dr. Marthakis attests it would have been inappropriate for her to add MAB medications to Lowe's treatment regimen, as his treatment was being managed by his GI specialists and unilaterally adding MAB medications would have interfered with the GI specialists' treatment plan. ECF 66-2 at 3-4. Here, it is true that Dr. Lyubashevsky concluded Lowe needed Humira back in 2013, and a physician at ISP submitted an FER at that time for Lowe to receive Humira. ECF 66-1 at 239, 252-53, 255. But it is also undisputed that when Dr. Marthakis arrived at ISP and began treating Lowe in 2018,

---

[4] Lowe also cites to a third exhibit, which is a record from his July 26, 2022, surgical consultation with Dr. Hood. ECF 771 at 4. Nothing in this exhibit states or implies that Dr. Marthakis should have submitted the OPR for the surgical consultation earlier than June 15.

Lowe was not receiving Humira but rather had active prescriptions for Colazal and Lialda. There is no evidence any of Lowe's GI specialists ever made a recommendation that he receive MAB drugs during the time he was under Dr. Marthakis' care between February 2018 and November 2022, and there is no evidence disputing Dr. Marthakis attestation that it would have been inappropriate for her to unilaterally provide MAB drugs without a recommendation from Lowe's GI specialists. Accordingly, no reasonable jury could conclude it was "plainly inappropriate" for Dr. Marthakis to defer to and implement the treatment recommendations of Lowe's GI specialists by providing him aminosalicylate medications and steroids rather than MAB drugs.

Accordingly, Dr. Marthakis has provided undisputed evidence she treated Lowe's UC and suspected Crohn's disease by regularly monitoring his condition, submitting OPRs so he could be seen by GI specialists when necessary, submitting OPRs and FERS to carry out the treatment recommendations of the GI specialists, and regularly prescribing Lowe the medications recommended by the specialists. In his response, Lowe provides no evidence by which a reasonable jury could conclude the treatment provided by Dr. Marthakis violated any standard of care or was "plainly inappropriate." Therefore, because the undisputed facts show Dr. Marthakis provided constitutionally adequate care for Lowe's UC and suspected Crohn's disease, summary judgment is warranted in favor of Dr. Marthakis.

For these reasons, the court:

(1) **GRANTS** Dr. Marthakis' motion for summary judgment (ECF 64);

(2) **DIRECTS** the clerk to enter judgment in favor of Dr. Marthakis and against

DeJuan Lowe and to close this case.

SO ORDERED on February 23, 2026.

  /s/ *Cristal C. Brisco*                          
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT